Matter of Edward V. V. (2005 NY Slip Op 52185(U))

[*1]

Matter of Edward V. V.

2005 NY Slip Op 52185(U) [10 Misc 3d 1068(A)]

Decided on December 28, 2005

Family Court, Chemung County

Brockway, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 28, 2005

Family Court, Chemung County
In the Matter of the Commitment of Guardianship and Custody pursuant to Section 384-b of the Social Services Law of EDWARD V. V. A Child Under the Age of Eighteen Years Alleged to be Permanently Neglected Child by N. V.
In the Matter of the Commitment of Guardianship and Custody pursuant to Section 384-b of the Social Services Law of
EDWARD V. V. A Child Under the Age of Eighteen Years Alleged to be Permanently Neglected Child by D. V.
B-04152-04

Joshua Navone for D. V.. Sarah Mathews for N. V.. Samuel D. Castellino for the Chemung County Department of Social Services, respondent. Sullivan Trail Legal Society, Inc. (Louise Johns, Of counsel), Law Guardian.

David M. Brockway, J.
Before the Court for consideration are two petitions filed by the Chemung County Department of Social Services (hereinafter the Department) seeking to terminate the parental rights of the respondents, N. V. and D. V. (hereinafter referred to collectively as respondents and individually as Ms. V. and Mr. V.), on the ground that they are unable to provide proper and [*2]adequate care of a child due to being mentally retarded as defined in Social Services Law § 384-b (4) (c). The child who is the subject of the petitions is Edward V. V. (a son born in 2003). Fact-finding hearings were conducted on the instant petitions on September 16, 2005 and September 30, 2005. At the conclusion of the hearings this Court permitted the parties to submit briefs [FN1] and this Court reserved decision.
FINDINGS OF FACT [FN2]
At the outset, the Court notes that in April 2004 respondents consented to a finding of neglect with respect to the subject child who had been placed in the custody of the Department after a removal at birth. The child has remained in the care and custody of the Department since that time as the result of several extensions of placement.
The Department first presented the testimony of Ms. Victoria G., the foster parent of Edward, who was placed at the G. home through the aforementioned neglect proceeding. Ms. G. testified that her home is comprised of her husband, her own small child and Edward. Edward has lived with the G.s continuously since the initial placement. Ms. G. indicated that her role as a foster parent is to keep Edward safe and healthy, and to provide a nurturing environment. The Court notes that while Ms. G. indicated that Edward is a physically healthy child, he does suffer from developmental delays, and requires speech therapy, physically therapy, and occupational therapy weekly.
The respondents' initial visitation schedule was established by the Department to be at the G. home once per week for three hours. According to Ms. G., the respondents were very diligent in making nearly all of their scheduled visits, and only missed one or two visits for legitimate reasons. During these joint visits, Ms. G. was present to supervise the visits between Edward and the respondents. Her credible description of the visitation sessions depicted both parents as needing constant supervision and direction. Notably, Ms. G. described Ms. V. as being overwhelmed by the tasks presented to her during the periods of visitation. Ms. V. would become frustrated at Edward when he was not cooperating with her and would often become rough with him during these times. Ms. G. described that on more than one occasion Edward would have bruising on his arms and thighs after visitation with the respondents. Ms. G. also indicated that Ms. V. is illiterate and had trouble reading labels and directions on Edward's baby formula and medication for his ear infections. Again, she described Ms. V. as becoming frustrated when she couldn't correctly measure Edward's formula or his medicine. Ms. G. testified that on one occasion, Ms. V. stated that the medicine "didn't need to be exact." Ms. G. further testified that during these visits, she worked with the respondents on the same issues over and over again. Specifically, feeding, bathing and changing Edward were difficult for respondents to master. Also, learning any new tasks was always a struggle.
Ms. G. also noted that Mr. V. was very passive and needed "maximum direction" during the visits for even the most mundane tasks. Ms. G. described that Mr. V. would often sit in the same spot on the couch during the visits and would need prompting to interact with Edward. The situation was exacerbated when Edward became more mobile and would wander off into other parts of the [*3]residence. Again, Ms. G. described that Mr. V. would need to be prompted to go check on Edward to ensure that he was safe.
The County also called Deborah Nichols to testify. Ms. Nichols is a foster care case-worker with the Department. She was assigned to the respondent's case from September 2003 until December 2004. [FN3] Ms. Nichols described that during the time she was assigned to the respondents' case, the permanency goal for Edward was reunification with the respondents. To that end, Ms. Nichols assisted the respondents in attempting to have them complete the terms and conditions that had been imposed on them at disposition, as a result of their consents to the neglect petitions. Namely, she would facilitate and assist the respondents with their programs, visitation, and any other appointments they may have had. Moreover, as the case-worker, Ms. Nichols testified that she wanted the respondents to have as much hands-on experience with their child as possible, and encouraged them, while at the numerous visitations she attended, to feed, bathe, and medicate Edward.
The visits also afforded Ms. Nichols an opportunity to observe the respondents' parenting skills. Ms. Nichols noted that Ms. V. had difficulty understanding basic concepts of infant care. For instance, Ms. Nichols described that she continually worked with Ms. V. in regards to feeding Edward, especially in measuring his formula. Ms. Nichols testified that she and Ms. V. worked for over a year on measuring the correct amount of formula to feed Edward. She described that it was very difficult for Ms. V. to grasp the concept of measuring due to her inability to read. Moreover, the problems became worse when the ratio of formula would change as Edward was growing.
Ms. Nichols also credibly described her concerns in regards to Ms. V. bathing Edward. She testified that Ms. V. would struggle with Edward during bath time, becoming frustrated when he would not comply with her demands. Eventually, Ms. Nichols testified, a decision was made to stop bathing Edward during the visits because Ms. V. was handling Edward in such a rough manner that he would become bruised from the process. Ms. Nichols further testified that both respondents' frustrations with Edward became more intense as he continued to grow and become more mobile, and thus made more demands on them. Finally, when asked if the respondents had made any progress in their parenting abilities during the time she spent supervising their case, Ms. Nichols testified that Ms. V. made only "slight" progress, and that Mr. V. made no real progress at all.
The Department next called RoseMary Wilcox to testify. Ms. Wilcox was a Community Service Aide employed by the Department. Ms. Wilcox worked with the respondents for a year, starting in June 2004. Ms. Wilcox indicated that her role as a Community Service Aide was to support and encourage the bond between the parents and the child and to assist as necessary through verbal communication. She further testified that the goal of the visitation between the respondents and the subject child was to strengthen that parental bond and to ultimately reunify the family. During the visits, Ms. Wilcox continually worked on the day-to-day needs of Edward with the respondents: bathing, feeding, changing diapers and engaging in appropriate play. Ms. Wilcox testified credibly that in her opinion, after having the opportunity to observe the respondents during numerous visits with Edward over the course of a year, that she would be concerned for Edward's physical safety were he to be left alone with the respondents.
She testified that the respondents had continuing difficulty performing the very day-to-day [*4]tasks upon which she repetitively worked on with them. Specifically, testimony was elicited that while Mr. V. did not participate in the bathing of Edward, Ms. V. did attempt to bathe Edward on numerous occasions. Her attempts had mixed results. Ms. Wilcox testified that Ms. V. would need to have instructions constantly repeated from one visitation session to the next, and that Ms. V. would become increasingly frustrated with Edward when he was non-compliant. In regards to feeding Edward, Ms. Wilcox testified that the respondents would often bring food to the visitation that was not age-appropriate. Moreover, the respondents would need direction and prompting during feeding time to, among other things, wash their hands, make sure food was cut into small enough pieces, and to ensure the Edward was not getting too much or too little food. Ms. Wilcox also described a number of incidents during feeding time in which Edward would become excited and stand up in his high chair. At such times, Ms. V. on a number of occasions grabbed Edward by his leg and forcefully pulled him back into a sitting position. In Ms. Wilcox's opinion, Ms. V. was being inappropriately rough with Edward during these occasions.
Ms. Wilcox further testified that Mr. V. was very passive during the visitation times and took no initiative in parenting the subject child at all. She observed that Mr. V. would neither interact with Edward nor check on his well-being without constant prompting. In one instance, Edward had placed a marker cap in his mouth (in the presence of Ms. Wilcox and Mr. V.) and Mr. V. took no action until prompted by her to intervene.
Dr. Jeffrey Donner was called by the Department as its expert witness. Initially, the Court finds that Dr. Donner's education and experience render him qualified to evaluate and offer an opinion as to each respondent's mental abilities and the related ability to respectively care for and raise the subject child. The Court finds credible, and amply supported by the record, Dr. Donner's opinion that the respondents, due to mental retardation, are unfit to parent this child. Dr. Donner based his conclusions upon testing, a review of the respondents' records, and upon four separate face-to-face meetings with each respondent. Moreover, he concluded that their current mental status would continue as such for the foreseeable future. Testing done by Dr. Donner revealed that Mr. V. is moderately mentally retarded with a full scale IQ of 51 (Petr. Exhib 6). Broken down into its individual components Mr. V. has a verbal IQ of 60 and a performance IQ of 51 (Petr. Exhib 6). As a result of his limited IQ, Mr. V. has a severe deficit in his problem-solving skills and difficulty adjusting to any novel situations. Dr. Donner tested Mr. V. in four different areas of functioning: intellectual ability, academics, general living, and parenting.
Dr. Donner explained that effective parenting requires the ability to communicate with others and adapt one's parenting style to meet the needs of the child. These tasks are made more challenging where, as in the matter at hand, the child has special needs.[FN4] Citing Mr. V.'s poor performance in the four areas of the aforementioned testing, Dr. Donner was pessimistic as to Mr. V.'s ability to safely parent any child. Specifically, in the area of intellectual ability, Dr. Donner noted that Mr. V. was moderately mentally retarded and that his ability to engage in abstract reasoning is very limited. In the area of academics, which included testing in the areas of reading, spelling, and math, Mr. V. performed poorly, scoring at or below a first grade level. In the area of general living skills, Dr. Donner noted that Mr. V.'s adaptive skills were so weak that he would have [*5]difficulty living on his own, and certainly would not be able to care for a child, without assistance from a third party. Finally, in the area of parenting skills, Dr. Donner testified that he did not believe that Mr. V. could even babysit a child by himself, let alone parent a child, due to his cognitive limitations.
After evaluating Mr. V., Dr. Donner opined that Mr. V. fell well below sub-average intellectual functioning, and that he also had impairment of his adaptive behavior.[FN5] Dr. Donner explained that adaptive behaviors are day-to-day functioning behaviors. Moreover, Dr. Donner testified that in the intellectual areas, Mr. V. would not improve from the functional level he has already attained, because his innate IQ would not vary. This would be true even if Mr. V. were to engage in classes or instruction dealing with parenting skills. Finally, Dr. Donner concluded with his opinion that a child placed in Mr. V.'s care would likely be in danger of becoming neglected.
With respects to Ms. V., testing done by Dr. Donner revealed that Ms. V. is mildly mentally retarded with a full scale IQ of 63 (Petr. Exhib 5). Broken down into its individual components, Ms. V. has a verbal IQ of 63 and a performance IQ of 70 (Petr. Exhib 5). Dr. Donner testified that Ms. V. has severe attention and concentration problems, which would act as a major impediment to her safely parenting the subject child. Dr. Donner also tested Ms. V. in the four different areas of functioning as outlined regarding Mr. V..
Specifically, in the area of intellectual ability, Dr. Donner noted that Ms. V. was mildly mentally retarded, and that she has weak cognitive discipline, which would limit her ability to organize, make proper judgments, and ultimately engage in any type of abstract thinking. Dr. Donner noted that these limitations would be problematic for someone trying to parent a child, because they would be unable to adjust to new or novel situations that would undoubtedly arise while parenting said child. Dr. Donner also indicated that this type of limitation would become exacerbated when dealing with a special needs child such as Edward, because there would be many more problems and issues that Ms. V. would be required to anticipate in order to safely and effectively parent Edward. In the area of academics, which included testing in the areas of reading, spelling, and math, Ms. V. also performed poorly, scoring at or below a first grade level. In the area of general living skills, Dr. Donner noted that Ms. V. actually performed quite well and was able to identify and respond appropriately to many health, safety and daily functioning issues. Dr. Donner testified that he believed Ms. V. is capable of taking care of herself and living independently. When tested for basic parenting skills, Ms. V. also performed fairly well. She was able to identify different levels of child development, and discuss the different needs a child may have at varying stages of development. However, Dr. Donner noted that because Ms. V. had limited problem-solving skills, she would be unable to react appropriately to any novel situations presented to her while parenting Edward.
As with Mr. V., Dr. Donner opined that Ms. V. fell well below sub-average intellectual functioning, and that she also had impairment of her adaptive behavior. Moreover, Dr. Donner testified that Ms. V. too, would not improve from the current functional level she has already attained, essentially noting that her IQ will not and cannot be elevated by any independent outside source. Finally, Dr. Donner concluded with his opinion that a child placed in Ms. V.'s care would likely be in danger of becoming neglected.
[*6]
The Department also called Dr. Veena Garyali, a licensed psychiatrist, to testify. Dr. Garyali was appointed by the Court pursuant to section 384-b(6)(e) of the Social Services Law to evaluate the respondents. Dr. Garyali testified that she met with the respondents on only one occasion and that she did not review any prior medical or psychological records of either respondent, but instead relied upon self-reporting for the background histories she received. Moreover, Dr. Garyali admittedly did not perform any type of IQ testing on the respondents.[FN6] Thus, while Dr. Garyali's opinions as to retardation were substantially similar to the other opinions rendered by the mental health experts the Court heard from, the Court has not relied upon Dr. Garyali's testimony in reaching its final conclusions, inasmuch as her findings were based upon what the Court views as a rather cursory, speculative evaluation process.
Mr. V. called Dr. Michael Morrongiello to testify on his behalf. At the outset, the Court finds that Dr. Morrongiello's testimony was credible, as it is clear that his opinions were based upon an extensive review of Mr. V.'s records and history, as well as upon Dr. Morrongiello's interviews with him. According to Dr. Morrongiello, the purpose of his evaluation was to determine Mr. V.'s mental capacity and whether or not he is able to care for his child. Dr. Morrongiello administered an IQ test and found that Mr. V. had a full scale IQ of 50 with a performance IQ of 53 and a verbal IQ of 55. Not unlike Dr. Donner's testing, these results, according to Dr. Morrongiello, place Mr. V. well into the range of moderate mental retardation. Dr. Morrongiello further found that Mr. V. had severe cognitive deficits which would make it difficult for him to safely parent the subject child. Notably, Dr. Morrongiello did not believe that Mr. V. was capable of understanding, processing and responding to information about the needs of the child. In assessing Mr. V.'s ability to adapt and adjust to potentially dangerous situations for the subject child, Dr. Morrongiello was equally pessimistic. Dr. Morrongiello opined that Mr. V. simply did not have the cognitive ability to anticipate potential harms to the child and to mitigate those situations. As to the potential for improvement in the foreseeable future, Dr. Morrongiello was doubtful of such improvement. Mr. V.'s limitations, combined with his limited mental flexibility, led Dr. Morrongiello to conclude that Mr. V. would be unable to learn new behaviors in the future. Thus, Dr. Morrongiello was doubtful that Mr. V.'s abilities would improve in the foreseeable future such that he could care for the subject child.
Ms. V. testified on her own behalf. Ms. V. for the most part gave appropriate answers to questions posed to her dealing with basic safety and welfare issues in raising a child. For example, when asked what she would feed Edward during the course of a normal day she testified that for breakfast she would feed Edward toast, apple juice and cereal. For lunch she indicated that she would feed Edward a peanut butter and jelly sandwich with juice and milk. And finally for dinner, she would cook a steak with milk, juice, bread and vegetables. Ms. V. also testified that if Edward was living with her she would play and read to him.
In regards to disciplining Edward, Ms. V. testified that if Edward were misbehaving, she would use a timeout chair for two minutes. When questioned on what discipline techniques she would use as Edward grew older, Ms. V. testified that she would send him to his room. She also testified that she would not hit Edward or yell at him when he was misbehaving.
[*7]
On cross-examination by the law guardian,[FN7] Ms. V. gave a number of perplexing answers. Specifically, when asked about Edward's disabilities, Ms. V. testified that the pediatrician's office had told her that Edward has a condition that "acts like Down Syndrome," and that the pediatrician is unsure how to treat Edward. Also, quite oddly, Ms. V. stated that Edward would most likely need an "operation for the tissue paper and make over his face" to help him speak better. Also, when asked about the treatment program set up for Edward, Ms. V. was unable to give any specifics on that treatment program, but did state that the program has not helped Edward in any way. Ms. V. also indicated that the only way Edward was improving was by listening to her.
The Court finds, after reviewing Ms. V.'s testimony, that her answers where very simplistic and did little to rebut the strong case made out by the Department. Indeed, a review of her testimony reveals an individual who is actually unsure of her parenting abilities. Ms. V. indicated on a number of occasions that she would need to check with friends or caseworkers if she didn't know how to handle a specific situation. Typical of the situations that were raised during testimony for which she might seek outside advice were such fundamental issues as: reading the instructions on a prescription, effectively disciplining Edward if she had problems controlling him, and responding appropriately if Edward was injured. While the idea of obtaining outside assistance may be laudable, it is obviously not conducive to the safety and well-being of any child, especially given such mundane issues. Certainly, as Dr. Donner and Dr. Morrongiello testified, parenting many times requires very rapid processing of information and quick decision-making. The responses by Ms. V. simply do not persuade this Court that she possess these qualities to a sufficient extent to safeguard the subject child.
CONCLUSIONS OF LAW To support a termination of parental rights on the grounds of mental illness or mental retardation, the petitioning agency must show, by clear and convincing evidence, that the parent is presently, and will, for the foreseeable future, be unable to provide proper and adequate care for the child[ren] by reason of the parent's mental illness or mental retardation (see, Social Services Law § 384-b [3] [g]; [4] [c]; Matter of Harris AA, 285 AD2d 755, [3rd Dept. 2001]; Matter of Donald LL., 188 AD2d 899, [3rd Dept. 1992]). Additionally, such child or children must have "been in the care of an authorized agency for the period of one year immediately prior to the date on which the petition is filed in the court (SSL § 384-b [4] [c]). Mental retardation as defined by Social Services Law § 384-b(6)(b) means "subaverage intellectual functioning which originates during the developmental period and is associated with impairment in adaptive behavior to such an extent that if such child were placed in or returned to the custody of the parent, the child would be in danger of becoming a neglected child as defined in the family court act." Pursuant to Family Ct. Act §1012(f) "neglected child" is defined in pertinent part as a child less that eighteen years of age

(i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care (A) in supplying the child with adequate food, clothing, shelter or education in accordance with the provisions of part one of article sixty-five of the education law, or medical, dental, optometrical or surgical care, [*8]though financially able to do so or offered financial or other reasonable means to do so; or (B) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment; or by misusing a drug or drugs; or by misusing alcoholic beverages to the extent that he loses self-control of his actions; or by any other acts of a similarly serious nature requiring the aid of the court ***
First, the facts clearly show that the child has been in the care of the authorized agency for a year immediately prior to the filing of the instant petition. Next, as to the more substantive issues, the Court had the benefit of the credible testimony of Dr. Donner and Dr. Morrongiello, among others, who evaluated one or both of respondents. The Court finds that the Department has sustained its petitions by clear and convincing evidence and concludes that based upon such testimony and facts adduced at the hearing respondents are mentally retarded as defined by law (see, Social Services Law § 384-b [6] [b]) and that their conditions currently prevent them from properly and adequately parenting and will do so for the foreseeable future.
As to Mr. V., both experts testified that he fell well within the range of moderate mental retardation.[FN8] Dr. Donner testified that because of Mr. V.'s limited intellectual functioning he would have problems engaging in abstract reasoning. Moreover, Dr. Donner opined that such limitations were innate and could not be improved by any type of instruction or training. With respect to Mr. V.'s adaptive behaviors, Dr. Donner opined that Mr. V. suffered from a severe deficit in his problem-solving skills that would impair his ability to appropriately react to the very day-to-day situations that any parent would normally encounter. Because of this deficit Dr. Donner testified, Mr. V. would not be able to safely parent any child. The Court reaches the same conclusion.
Dr. Morrongiello's testimony was in accord with much of Dr. Donner's findings. Dr. Morrongiello testified that due to Mr. V.'s cognitive deficits Mr. V. could not fully appreciate nor comprehend potentially dangerous situations that would undoubtedly arise if he was to parent the subject child. As with Dr. Donner, Dr. Morrongiello was doubtful that Mr. V. could improve his parenting skills. Dr. Morrongiello stated that given Mr. V.'s age, health and limited mental functioning that no amount of instruction would assist him in learning new behaviors in the future.
With respect to Ms. V., Dr. Donner testified that she exhibited limited intellectual functioning, with a full scale IQ of 63, which placed her in a range of mild mental retardation. Dr. Donner opined that such limitations would act as an impediment to any type of abstract reasoning or real-world problem solving skills. Again, Dr. Donner testified that Ms. V.'s IQ was innate and would remain consistent even if she were to engage in parenting classes. Finally, Dr. Donner testified, as he did with Mr. V., that Ms. V.'s adaptive behavior was impaired. Such impairment was a result of her limited intellectual functioning, resulting, inter alia, in her exhibiting severe attention and concentration problems.
[*9]
Both Dr. Donner and Dr. Morrongiello testified, and the Court so finds under all the evidence, that if Edward were left in the care of either or both of the respondents, he would be in danger of becoming a neglected child. The testimony at trial, including the opinions of the experts, convincingly shows that the respondents simply cannot safely parent the subject child. (see generally, Cheryl YY v. Lavetta ZZ., 302 AD2d 632 [3d Dept. 2003]; Tiffany S v. Emily S., 302 AD2d 758 [3d Dept. 2003]). The evidence demonstrates that neither parent would be able to make appropriate decisions regarding day-to-day issues of safety, planning, forethought or parental insight. Moreover, the failure of the respondents to be able to adequately engage in most simple skills and tasks would place Edward in an environment where not only would he not flourish, but he would be in physical danger. This assessment is more than amply supported by the testimony reviewed by this Court and cited above, which conclusively indicates that neither respondent has been able to apply the hands-on skills attempted to be taught to the parties (whether abstractly in parenting classes or concretely during times of visitation) by attempted application of skills to real-life situations. This documented lack of progress by either party strongly buttresses the opinions offered by both Dr. Donner and Dr. Morrongiello that respondents simply do not (and will not) have the cognitive ability to learn the basic parenting skills necessary to safely and effectively protect, properly supervise, nurture and parent the subject child.
Accordingly it is hereby
ORDERED that the petitions filed by the Chemung County Department of Social Services are sustained. The custody and guardianship of Edward V. V. is hereby placed with Chemung County Commissioner of Social Services, who shall proceed in accord with the Social Services Law; and it is further
ORDERED that the Clerk of the Court promptly schedule a permanency hearing as provided by law.[FN9]

_________________________________________ Hon. David M. Brockway, J.F.C.
 
NOTICE: PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL MUST BE TAKEN WITHIN THIRTY DAYS OF RECEIPT OF THE ORDER BY THE APPELLANT IN COURT, THIRTY-FIVE DAYS FROM THE MAILING OF THE ORDER TO THE APPELLANT BY THE CLERK OF THE COURT, OR THIRTY DAYS AFTER SERVICE BY A PARTY OR LAW GUARDIAN UPON THE APPELLANT, WHICHEVER IS EARLIEST.
cc:File
CAO
DSS
LGO
Joshua Navone, Esq.
Sarah Matthews, Esq.
Family File No.: 17344

Footnotes

Footnote 1:1 The last brief was received by the Court on October 24, 2005.

Footnote 2: These findings are intended to provide a basis for the Court's decision. To the extent that the testimony of a witness is not reviewed herein does not mean that the Court did not carefully consider the testimony but rather that the Court did not find the testimony relevant to the ultimate questions in the case.

Footnote 3: At that time, Ms. Nichols was transferred to another unit within the Department.

Footnote 4: As previously noted by the Court, Ms. G. testified that Edward suffers from developmental delays, and requires speech therapy, physically therapy, and occupational therapy weekly

Footnote 5: See, SSL 384-b(6)(b).

Footnote 6: Such testing is generally done by psychologists not psychiatrists. 

Footnote 7: The Court notes that counsel for the Department chose not to conduct any cross-examination of Ms. V..

Footnote 8: Testing done by Dr. Donner resulted in a full scale IQ of 51, while testing done by Dr. Morrongiello showed a full scale IQ of 50.

Footnote 9: Under provisions of new legislation effective 12/21/05, a permanency hearing for freed children must be commenced within 30 days after such freeing (SSL § 1089 [a] [1]) on notice to all parties except respondents.